## THE CAMDEN AND AMBOY RAILROAD AND TRANSPORTATION COMPANY v. BRIGGS.

1. Penal statutes are to be construed strictly, remedial statutes more liberally.
2. Grants and charters to corporations are to be construed favorably to the rights of the public, and most strongly against those claiming under them.
3. Railroad, canal, bridge, turnpike, and ferry companies have no power to take toll by implication, but only by express grant in their charters, and the right granted will not be extended by implication ; and on questions of tolls, freight, and fares, courts uniformly construe such charters most in favor of the public and against the company.
4. The restriction or rates in the sixteenth section of the charter of the Camden and Amboy Railroad and Transportation Company extends to the whole route from Philadelphia to New York, as well upon the water as the railroad.
5. If certain rates of toll and fare be fixed by the charter of a company, a subsequent act, inflicting severe penalties on the company for exceeding the charter rates, is no violation of the contract of the charter, and is not unconstitutional.

Peter Briggs commenced an action before Eli Morris, one of the justices of the peace in and for the county of Mercer, against the Camden and Amboy Railroad and Transportation

Company for a penalty, and recovered a judgment for the amount of penalty and costs. The defendants brought the case up, by *certiorari*, to the Supreme Court, where the cause was argued, and the judgment below affirmed upon the following state of the case, agreed upon by the parties :

"This was an action of debt, brought by Peter Briggs, the plaintiff below, against the Camden and Amboy Railroad and Transportation Company, for the recovery of a penalty of one hundred dollars, under the act to prevent the taking of unlawful toll or fare on canals and railroads (*Rev. Stat.* 601), for an alleged violation of law in charging more than they were authorized to charge for the transportation of certain merchandize from the city of New York to the city of Trenton, by the way of South Amboy and Bordentown.

The plaintiff below proved that the defendants, on the twenty-ninth of January, eighteen hundred and forty-six, charged Briggs & Bacon, partners, trading, &c., the sum of ninety-six cents for one box, of the weight of two hundred and forty pounds, for the transportation of the same from the city of New York, by the way of the Camden and Amboy railroad, to Trenton. That the same was transported by the steamboat of the company from New York to South Amboy, a distance of 30 miles ; thence in the cars of the company, over the company's railroad, to Bordentown, a distance of 35 miles ; and thence, over the company's railroad, to Trenton, a distance of 6 miles, the whole distance being 71 miles ; and that said transportation was done by, and for the benefit of the said company, the defendants below. The bill was paid, by the plaintiff below, to the agent of the company. The justice gave judgment thereupon for the plaintiff, for the penalty of one hundred dollars and costs. And it is agreed by and between the parties, by their respective attorneys, that if upon the above state of facts the plaintiff below was entitled to recover, that then the judgment be affirmed, otherwise that it be reversed."

All the acts relative to the Camden and Amboy Railroad and Transportation Company were in evidence before the justice.

*S. G. Potts*, for plaintiffs in error.

This is an action brought by Briggs, for a *penalty* for a forfeiture under the act (*Rev. Stat.* 601), incurred by taking more than legal toll. By this case, it appears that more than eight cents per ton per mile was taken between New York and Trenton; but it does not appear how much of it was taken for the road, and how much for transportation on the water, to which the restriction does not apply, or say that the excess was on the water; and in a penal action the violation of law must clearly appear.

1. The penal statute only applies to tolls on canals and railroads; the preamble and remedy show this. The words *any incorporated companies* are restrained by other parts of the act; it does not apply to bridge or steamboat companies. 2 *Green* 21, *Allaire* v. *Howell Works;* 2 *Gallison* 492, *U. S.* v. *Haywood;* 2 *Cranch* 358, *U. S.* v. *Bright et al.* It is clear that the penalties of the act are only intended for overcharges on canals and railroads, not steamboats.

2. In the charter there are no words restricting the amount of tolls or fare from Amboy to New York. The word "thereon," in the sixth section of the charter, both by grammatical and legal construction, can only be held to apply to the railroad.

The word "thereon," in the sixteenth section, must be held to refer to "railroad," in the fifteenth section, and not to "communication," in the second section.

The charge does not refer to the waters from Amboy to New York, because they are out of the jurisdiction of the state, and the state had no power to authorize a toll on waters out of the state, or to restrict it. *Federalist, Nos.* 22 and 42; 9 *Wheat.* 1, *Gibbons* v. *Ogden.*

New Jersey has always opposed such claim by the state of New York. *Rev. Stat.* 547, 564.

The object of the charter was only to impose a restriction on the new route created by it.

If there is any doubt, the rule that penal statutes are to be construed strictly, will in this action decide that doubt in favor

of the company. 1 *Blac. Com.* 88; *Esp. on Stat.* 54; 2 *Black. R.* 1226; 4 *T. R.* 490; 4 *U. S. C. R.* 593; *Paine's C. C. R.* 32.

Again, the act imposing the penalty was passed subsequent to the charter. The legislature had no right to pass any act which would impair or alter the terms of the charter; it was a contract, and beyond their control.

The following cases were also referred to: *Baldwin* 205, *Bonaparte* v. *Canal Co.*; 5 *Ad. & Ell.* 747, *Canfield* v. *Louden and Bergh*; 2 *Railway Cases* 629; 1 *Ib.* 193, 563.

*W. Halsted*, for defendants in error.

1. The construction of the Supreme Court, applying the limitation or charge to the whole route, is the true judicial construction, based on the intention, to be gathered from the whole act. Its object was to provide communication and transportation from New York to Philadelphia; and a restriction or rate of charge that did not protect the whole route would be utterly useless.

The antecedent of " thereon," in section sixteen, are not the words pointed out by mere proximity, but by the object and intention of the act and of that provision.

The company cannot charge toll or for transportation, unless the right is expressly granted. 4 *N. Hamp. R.*, *Olcott* v. *Bancroft*; 6 *B. & C.* 703; 10 *East* 334; 2 *Strange* 1161; 7 *Com. Dig., Tolls E.* 479; 11 *East* 674; *Gildart* v. *Gladstone*, 2 *B. & Ald.* 66; *Hustler* v. *Leeds and Liverpool Canal*, 1 *B. & C.* 424; 2 *B. & Ad.* 792; 2 *Man. & Gr.* 134; 164–5; 3 *Ib.* 496; 7 *Ib.* 870; 11 *Pet.* 544, *Charles R. Bridge* v. *Warren Bridge*; 6 *Conn.* 240, *Catlin* v. *Eagle Bank*; *Angell and Ames on Corp.* 59, 60; *Saxton* 591; 1 *Hal. Ch.* 169; *Van Wyck* v. *Som. Man. Co.*; 6 *Bac. Ab. tit. Stat. I.* 7, 8; 17 *Ver. R.* 479.

Penal statutes are not restrained by construction within their plain intent, nor by preamble. 10 *Mod.* 282; 1 *Str.* 253; 6 *Bac. Stat. I.* 2; 2 *Cranch* 400; 3 *Atk.* 205.

*Vroom*, for defendants in error.

The question is, whether, in the sixteenth section, limiting the charge, the *road* or *route* is meant by the word thereon.

The object of the act was to secure and keep open a communication from city to city. They are to provide steam vessels at each end of the road to carry passengers.

In the supplements of February 13, 1841, and March 2, 1832, the limitation of toll expressly is from city to city; this shows the understanding of the company and the legislature. 3 *Railway Cases* 589, *Parker* v. *Great Western Railroad.*

The legislature have power to enable the company to take fare on the whole route; the restriction to these rates is based on this power, and this restriction on water is necessary, as there can, in practice, be no competition with the boats of the company.

Charters are to be construed strictly as to companies, and liberally as to the public. 1 *Railway Cases* 659.

The company are in reality a transportation company, not a mere road company. The seventh section provides for their having steamboats to transport, &c. And though the road is declared a *public highway*, it is not so in the ordinary sense of the term.

It belongs to a private corporation; the public cannot get on or off at pleasure, and the tolls for using it, being made equal to the charges for transportation, effectually exclude the public from using it as a highway.

The company must go back to their charter for power to carry passengers or freight, either upon or off the water; a creature of their charter, all their powers are derived from and limited by it. *Angell & Ames on Corp.* 232, 233, and 84.

In the construction of statutes where the intention is expressed, that intention is to be followed, even when contrary to the words of a particular section. 2 *Cowen* 89, *Jackson* v. *Collins*; 2 *Cranch* 33 and 386; *Bac. Abr. Stat. I.* § 10, and *I.* § 6; 3 *Rep.* 27, *Butler* v. *Baker.*

The statute inflicting the penalty applies to this case, (*R. S.* 601). The title speaks of toll or fare, the preamble of toll or passage money, and the act of charge, toll, rates, or fare.

If in this case there is an overcharge on the whole route, there is on each part of it, and the penal statute of overcharging on canals and railroads applies.

The general doctrine is, that a penal statute is to be construed strictly, but even in them the intention of the law is to be followed. *Bac. Abr. tit. Stat. I.* 390 and 391; *Bald.* 78, *U. S.* v. *Porter and Wilson;* 13 *John.* 497; 3 *Rep.* 7; *Ib.* 73; *Paine* 32.

The act inflicting penalties does not violate their charter, it only compels them to observe it by additional penalties.

*Field,* for plaintiffs in error.

The great question in this cause is, whether the restriction contained in the sixteenth section of the act incorporating the Camden and Amboy Railroad and Transportation Company is confined to the *railroad,* or whether it extends to the *water carriage* between Amboy and New York.

In the first place, let us look at the *words* of the act : "That the said company are hereby authorized to demand and receive such sum or sums of money for tolls, and the transportation of persons and every species of property whatsoever *thereon,* as they shall from time to time think reasonable and proper; *provided,* that they shall not charge more than at the rate of *eight* cents per ton per mile," &c.

The restrictions upon the power to charge tolls, cannot, of course, be more extensive than the power itself. On what, then, are the company empowered to charge for tolls and transportation? The answer to this question depends upon the meaning of the word "*thereon.*" It is a word of reference, and points to an antecedent; and, by the plainest rules of construction, that antecedent is to be sought for in the sections immediately preceding the one under examination. To search for it in some *distant* and *remote* section, would be to violate the principles of English grammar as well as of common sense.

Now there are five sections immediately preceding the one in question, in each of which we find the antecedent to which the word *thereon* manifestly refers. By the eleventh section, the company are empowered to construct a *railroad* from the Delaware river, near Camden, to a suitable point on the Raritan bay. The twelfth section authorizes them to construct a *lateral railroad* to Bordentown. The thirteenth and fourteenth

sections provide compensation for the use of the land to be taken for their *road*, and point out the mode of ascertaining its value. The fifteenth section makes it the duty of the company to construct bridges or passages over their *railroad*, where it intersects other roads. And then we come to the sixteenth section, which authorizes the company to charge for tolls and transportation " *thereon.*" Is it not perfectly clear, therefore, that the word " *thereon* " refers to *railroad*, and can refer to nothing else? Such is, undoubtedly, the *literal* construction of the clause under consideration. There is not the slightest ambiguity in the language; he who runs may read it. Now it must be a very strong case, indeed, that will induce a court, in the construction of a statute, to depart from the plain meaning of the words which are employed; to decide that the legislature, while they have *said* one thing, really *meant* another.

But, not to adhere too closely to the words of the clause in question, let us look at the *context.* In a subsequent part of the section we find this expression, " the said railroad." And yet the term " railroad " does not occur before in the section, unless *thereon* means *railroad.*

But this is not the only section in which the word *thereon* is made use of. It is found in several other sections of the act, in the seventh, the eleventh, the twenty-third; and wherever it is found it means railroad, and nothing else. Why, then, should it not be understood to mean the same thing in the sixteenth section. It also occurs twice in the twenty-third section of the charter of the Delaware and Raritan Canal Company, where it refers to *canal.*

The context, then, sustains the literal interpretation of the section.

But let us see what are the *effects* and *consequences* that flow from the construction contended for on the other side. The word " *thereon,*" we are told, is not confined to the *railroad*, but extends to the whole line of communication between New York and Philadelphia.

Now what are the company authorized to charge " thereon ? " *Tolls* and *transportation.* It is of the utmost importance, in

this connection, to understand clearly the meaning of these terms, more especially as Judge Nevius, in pronouncing the opinion of the court below, seems entirely to have lost sight of the distinction between them.

Fortunately there are no two words the meaning of. which is better settled, either in popular or legal language. Webster defines *tolls* to be " a tax paid for some liberty or privilege, particularly the privilege of passing over a bridge, or on a highway, or for that of vending goods in a fair or market." Transportation, on the other hand, is defined to be, as indeed its derivation clearly implies, " the act of carrying or conveying from one place to another." Such, too, is their legal sense.

By " *tolls*," then, in the charter of the company, is meant a compensation for the use of their railroad ; for the privilege of passing over it ; just as a turnpike company is allowed to charge *tolls* for the use of their turnpike road. By " *transportation* " is meant an entirely different thing, a compensation for the conveyance of goods or passengers over the railroad ; just as stage proprietors receive compensation for carrying over a turnpike road.

This distinction between *tolls* and *transportation* is never lost sight of by the legislature. It is distinctly recognized in the very act upon which this prosecution is founded. *Rev. Stat.* 601.

It is also recognized in the charter of the New Jersey Railroad Company, *Harr. Com.* 381, § 8, 383, § 13.

The same distinction is kept in view in acts of incorporation passed by other states. See *Charter of Philadelphia and Trenton Railroad Company*, § 13 and 14.

The plaintiffs in error are not only a *railroad*, but a *transportation company*. They act in a twofold capacity, as *proprietors of* the road and *common carriers on* the road. It is usual for railroad companies to combine these two functions, but not necessary. One set of men might own the road, and another do the transportation. That is the case with turnpike companies. It is also the case with many of the railroads in Pensylvania.

But this company was designed to act in a double capacity.

It may charge *tolls* for the use of the road, and *transportation* for carrying goods and passengers. Other persons may also carry over the road. Then the company can only charge for *tolls;* but if they carry themselves, for tolls and transportation. This is also the case with most of the English railways. See *Queen* v. *The London and Southwestern Railway Co.,* 2 *Railway Cases* 648.

Such is the meaning of the terms *tolls* and *transportation,* as used in the sixteenth section. Now, on what may the company charge them? The answer to this will settle the meaning of the word *thereon.*

Did the legislature mean to authorize the company to charge *tolls* on the waters between Amboy and New York? That they had no right to do so, it is, of course, unnecessary to argue. Is it to be presumed, then, that they meant to clothe this company with a power which *they* had no right to confer, and which the company could not exercise? And is this presumption to be made in the very face of the language they have employed?

It is, I think, the very last power which a New Jersey legislature would undertake to exercise, remembering, as they must, the controversy which once shook our judicial and legislative halls, in reference to an exclusive right set up by New York to the use of these waters.

On the *railroad,* it was right that the company should be authorized to charge *tolls,* for it was constructed at their expense. But what have they done to improve the navigation of the waters between Amboy and New York? They are in the same condition now as when first discovered by Hudson.

If, then, the right to charge *tolls* and *transportation* is confined to the railroad, and cannot, by possibility, extend to the waters between Amboy and New York, must not the *limitation* also be confined to the railroad?

If the legislature meant to extend the restriction to the whole line of communication from city to city, why did they not say so?

We shall see that when such was their intention, they had no difficulty in expressing it in clear and unambiguous terms.

By the act of February 15, 1831, relative to the Delaware and Raritan Canal and the Camden and Amboy Railroad Companies, it is provided, " That it shall not be ·lawful for the said companies to charge more than three dollars for the transportation of passengers *from and to the cities of New York and Philadelphia.*"

But now, because the legislature meant to extend the restriction to the whole line, when they *said so,* the counsel on the other side argue, that they must have meant it when they *did not say so.*

There was some reason, however, for extending the restriction to the whole line of communication in the supplement to their act of incorporation, whereas, in the original charter, there was no reason at all for it.

By the original charter, the only protection given to the company was confined to the *road itself.* No other railroad was to " commence and terminate within three miles of the commencement and termination of the Camden and Amboy Railroad." See 24*th section of charter.*

It was proper, then, that the *restriction* should be confined to the road.

But, by the supplements, protection is extended to the whole line of communication from city to city, the legislature expressly stipulating not to authorize the construction of any other railroad " *which shall be intended or used for the transportation of passengers or merchandise between the cities of New York and Philadelphia.*" *Act March* 2, 1832, *section* 2.

Now there was some· propriety in restricting the company as to what they should charge on the whole line of communication. But this restriction the legislature thought proper to confine to *passengers* alone, and did not extend it to the transportation of *property.* They might have done so undoubtedly, and the company·would have been bound by it, inasmuch as they accepted these supplements to their charter. But, having neglected to do so, an effort is now made to supply the omission, by putting upon the original charter a construction which it never could have been intended to bear, and which is· as re-

pugnant to its spirit as it is to its letter. This would be carrying judicial legislation to an extent quite beyond any thing that has ever been witnessed, at least in New Jersey.

The restriction, too, contained in the supplements prior to 1837, was not only confined to passengers, but to *through* passengers, as they are called, passengers from city to city. It did not include *way* passengers; they were left subject to the provisions of the sixteenth section of the charter, where the only limitation was ten cents a mile.

Now if we could find in any of the supplements a reduction of this charge for way passengers, we might discover how far the legislature supposed the limitations contained in this sixteenth section extended, whether to the whole line of communication or to the railroad alone. Well, look at the act of March 15, 1837, by the third section of which the limitation upon way passengers is reduced to five cents per mile. What is its language? " That it shall not be lawful to charge more than five cents per mile for the transportation of each and every way passenger." Where? on the whole line from city to city? No, but " *on the road of the Camden and Amboy Railroad and Transportation Company.*" It is very clear, therefore, that this reduction of the way fare is confined to the road alone, and does not extend from Amboy to New York. But is it conceivable, that if the legislature had supposed that the limitation of ten cents per mile in the original charter was applicable to passengers from Amboy to New York, that they would not have made the reduction to five cents applicable to the same passengers? Can any motive be assigned for reducing the way fare upon the road, and not from Amboy to New York, except a conviction that the limitations contained in the original charter had nothing to do with the water carriage?

Here, then, we have a very clear legislative construction of the meaning of the sixteenth section.

A great deal has been said about the *exclusive privileges* of this company, and that all the public would be entirely at their mercy, if the construction which they contend for is sustained. But let it be remembered that none of these *exclusive privi-*

*leges* were conferred by the original charter. They were all given by the supplements. When the company was incorporated, railroads were an untried experiment. The project was considered by many, perhaps by most, as a visionary one. Hence the most *liberal* charter was readily granted, in order to encourage the enterprise. The idea of protecting the public against the company never entered into the mind of any one. The limitation of *ten cents per mile* for passengers, was really no limitation at all. It was more than had ever been charged by stages and steamboats. It was not until exclusive privileges were given, that it became necessary to protect the public.

There is another reason why this limitation could not have been intended to apply to the water carriage between Amboy and New York. So much a *ton* is an unheard of mode of charging for *carriage by water*, if by a ton be meant twenty hundred weight. On a railroad, it is a usual and a proper mode, for the wear and tear is the same whether the articles be gravel or gold. But on the water, the chief elements which enter into the cost of transportation are *bulk* and *value*. Hence *ton*, in a commercial sense, means forty-two cubic feet. The company, too, are insurers, and the risks which they incur are chiefly on the water. With what propriety, then, could the same limitation, as to charge, be applied to a ton of rags, worth twenty dollars, perhaps, and a ton of silks, worth twenty thousand.

But it is said, by the second section of their charter, the company are to " perfect an expeditious and complete line of communication from Philadelphia to New York ; " and, therefore, the restriction contained in the sixteenth section must be intended to apply to the whole line. But the very same provision is contained in the second section of the charter of the Delaware and Raritan Canal Company ; and did any one ever suppose that, therefore, the restriction upon the rates of toll, contained in the seventeenth section of their charter, was meant to extend beyond the *canal*, and to embrace the carriage from New Brunswick to New York ?

Besides, the company were not to *make* a line of communi-

cation from New York to Philadelphia, but to *perfect it.* From New York to Amboy it was already made. It needed no improvement. It was a great natural highway, free and open to all. It was to be *perfected,* that is completed, by a railroad from Amboy to Camden. This was what the company were alone authorized to make, and to this were the provisions of the charter confined.

But the construction contended for on the other side, is said to be necessary for the protection of the *just rights* of the company. If the limitation, they say, contained in the sixteenth section, is confined to the road, the right to charge must also be confined to it; and then it will follow that the company have no right to charge at all from Amboy to New York. Such, too, is the reasoning of Judge Nevius, in pronouncing the opinion of the court below.

Is there the slightest foundation for such an idea? That the company are authorized to transport passengers and property from Amboy to New York, is not denied. Nay, by the seventh section of their charter, it is made their *duty* "to provide suitable steam or other vessels" for the very purpose. How, then, can any one doubt as to their right to *charge* a reasonable compensation for such transportation? They are not only authorized, but obliged to be *common carriers* from Amboy to New York. *Freight,* then, is chargeable of common right. They certainly need no express power to charge it. Can they be subject to the *liabilities* of common carriers, without being entitled to their privileges? It might as well be contended that a company incorporated for the purpose of manufacturing goods, have no right to *sell* them without an express power to that effect. Suppose a company were incorporated to run a line of stages from Trenton to New Brunswick, would they have no right to charge for the transportation of passengers, unless expressly authorized to do so?

But it is insisted that the company, having the entire monopoly of the carrying trade between Philadelphia and New York, it would defeat the very object of the limitation, if it were not extended to the whole line of communication. But how did the company acquire this monopoly? Certainly not

by their *original charter ;* and it is with this, alone, that we now have to do. The question is, how this original charter is to be construed, and that was the intention of the legislature when they granted it. Now nothing is more certain than this, that the legislature originally had no idea of conferring upon this company any exclusive privileges whatever. On the contrary, on the very day when they incorporated the Camden and Amboy Railroad Company, they also incorporated the Delaware and Raritan Canal Company for the very same purpose, of transporting passengers and property between New York and Philadelphia. True, these companies have since become consolidated ; but nothing was farther from the intention of the legislature at the time when they were created. They were designed to be *rival* companies ; and while it was believed that the railroad might successfully compete with the canal in the carrying of *passengers*, yet in the transportation of *property* it was generally supposed that the canal would have greatly the advantage. And hence, while the railroad company were permitted to charge as high as *eight* cents a ton per mile, the canal company were limited to *four* cents a ton ; so little idea had any one at that time that a monopoly of the carrying trade was to be enjoyed by the railroad company.

What, then, becomes of the argument founded upon the *exclusive privileges* of the company ? And yet this is the argument upon which the Supreme Court appears mainly to have relied. When it was proposed to confer these exclusive privileges, there might have been some reason for extending the limitation over the whole line of communication ; but the legislature did not think proper to do so. And can this court now say that they meant to do so, when there was no reason at all for it, and when their language expressly negatives any such idea?

Nor has the omission to extend the limitation over the whole line worked any injury to the public. For seventeen years the company have acted under the full persuasion that they were not limited in their right to charge between Amboy and New York. And what has been the consequence ? does any one complain that their charges are *unreasonable ?* This

is not the complaint. The truth is, they have always encountered, in the *coasting trade* between the two cities, a keen competition, under the influence of which they have been obliged to reduce their charges, from time to time, until they are now so low as to be, I believe, entirely satisfactory; for while, upon small packages and for light goods, their charges between Amboy and New York may rise above the limitation of eight cents a ton, upon other articles they fall considerably below it.

So that, to whatever test we subject this sixteenth section of the company's charter, whether we look at the words, or at the context, or at the whole scope and spirit of the act, the conclusion is irresistible, that the *limitation* is confined to the road, and does not extend to the water carriage between Amboy and New York.

But suppose we are wrong in our construction of the charter, are we within the provisions of the act of 1839, upon which this prosecution is founded ? *Rev. Stat.* 601.

The complaint is, that we have charged more than we had a right to charge *between Amboy and New York.* We have attempted to show that we did not. But suppose we did, was this *the taking of unlawful toll or fare on a canal or railroad?* For it was to prevent *this* that the act of 1839 was passed. It is entitled, "An act to prevent the taking of unlawful toll or fare on canals and railroads." And the language of the act shows most clearly that this was the only object which the legislature had in view, for it provides that suits for the recovery of the penalty shall be prosecuted "before any justice of the peace in any county of this state, through which the *said road or canal may pass."* Suppose these goods had been carried *from New York to Amboy* alone, could it be pretended that we would be within the provisions of the act ? In what county could the suit be prosecuted ? It is submitted that the case is not altered by the fact, that the goods, after being taken to Amboy, were carried on the railroad to Trenton. For it is for the excessive charge alleged to have been made between Amboy and New York, that the suit is really brought. Upon the most *liberal* principles of construction,

then, we cannot be brought within the provisions of this act of 1839.

But how is this act to be construed ?     It is an act highly and exclusively *penal.*  Its harshness and severity are unrelieved by one single remedial feature.  The penalty is not given to the *party grieved.*  He may not have complained ; he may have consented to the charge.  It is given to the *common informer ;* and, to stimulate his cupidity to the utmost possible extent, the *whole* of it is given to him : no part of it to the state.  A more vindictive statute could not well be imagined.

Now, penal statutes are to be *strictly* construed.  This has become an axiom in the law.

" The rule," says Chief Justice Marshall, in *U. S.* v. *Wiltberger,* 5 *Wheat.* 95, " that penal laws are to be construed strictly, is perhaps not much less old than construction itself." It was insisted, in that case, that the *intention* of the law maker must govern in the construction of penal, as well as other statutes.  This, said the Chief Justice, was true ; but he added, " the intention of the legislature is to be collected from the *words* they employ.  To determine that a case is within the intention of a statute, its language must authorize us to say so." See, also, what he says on page 105.

" Every body knows," says Chief Justice Holt, in *the Queen* v. *Whistler,* 7 *Mod. Rep.* 134, " a penal law ought, by equity and reason, to be construed according to the *letter* of it, and no further, although the fact that you would bring under it be within the reason, and as heinous or more than that which is expressed in it."

This being a penal action too, if a reasonable *doubt* exists as to the true construction of our charter, we are entitled to the benefit of it.  If the action were merely to recover back the overcharge, the rule would be different.  There the presumption would be against, rather than in favor of the company.

A penal action is in the nature of a *criminal prosecution.* The company cannot be guilty, without an *intention* upon their part to violate their charter.  If they were *honestly* mistaken with regard to its true construction, they ought not to be convicted.  Who will say that the meaning of the sixteenth

section is not one about which, at the very least, there might be an honest difference. The mere fact, that this company have, under the advice of counsel, during the whole period of their charter, put upon it the construction now contended for, and that it has never before been questioned, notwithstanding the sleepless vigilance with which all their acts have been scrutinized, ought, if there were nothing else in the case, to be a complete protection to them in this action. Where has this construction slept so long that it should now for the first time rise up for their destruction?

The CHANCELLOR. The second section of the act of incorporation declares the general object of the act to be, to perfect an expeditious and complete line of communication between the cities of New York and Philadelphia.

The eleventh section enacts that, to facilitate the objects of the act, the president and directors of the company are authorized to survey, lay out, and construct a railroad from the Delaware river to a suitable point on the Raritan bay.

The sixteenth section authorizes the company to demand and receive such sum or sums of money, for tolls and the transportation of persons and property thereon, as they shall from time to time think reasonable and proper; *provided*, that they shall not charge more than at the rate of eight cents per ton per mile for the transportation of property, nor more than ten cents per mile for the carriage of each passenger.

The seventh section enacts that it shall be the duty of the company to provide suitable steam or other vessels, at either extremity of the road, for the transportation of passengers and produce from city to city, so that no delay shall occur for want thereof.

We thus have an act of the legislature of New Jersey incorporating a company, and authorizing the corporation to construct a railroad in New Jersey, for the purpose of perfecting an expeditious and complete line of communication between the cities of New York and Philadelphia; the other parts of the contemplated line of communication between the said cities being on and over waters common to all the citizens of

the United States for the purpose of navigation, and lying partly in Pennsylvania, partly in New York, and partly, only, in New Jersey; and authorizing the corporation to charge eight cents per ton per mile for the transportation of property, and ten cents per mile for the carriage of a passenger on the said road; and requiring the corporation to provide suitable steam or other vessels, at either extremity of the road, for the transportation of passengers and produce from city to city.

The railroad is sixty miles long: so that the act, by the tolls it gives on the road, allows the corporation $6 for every passenger, and $4.80 for every ton of goods transported from city to city.

Whether the legislature were liberal, or otherwise, in requiring that for these sums, allowed by way of tolls on the road, the corporation should provide vessels at the extremities of the road, to take passengers and goods over the intervening waters to the cities, respectively, is not a question for the consideration of the courts. But it may not be amiss to say that the company are now transporting passengers from city to city for half the sum thus allowed by the act; and I presume that this is true, also, in respect to the transportation of goods by the ton; and, for aught we know, the company may, even at the prices now charged by them, be reaping most liberal returns for their expenditures under the act.

Is there any difficulty in believing, or any reason why we should seek, by construction, to avoid the conclusion that the legislature intended that, for the rates of toll per mile on the railroad, the company should provide a vessel to take passengers and goods across the Delaware from and to the western *terminus* of their road? And if the act requires this, it requires the company to provide a vessel to take passengers and goods over the waters lying between the eastern *terminus* of the railroad and the city of New York; the duty of providing vessels at each extremity of the road being imposed by one and the same clause in the act.

The company claim that, inasmuch as the act only restricts them to a rate of toll on the railroad, they are at liberty to charge without restriction or limit for transportation on and

over the said waters; and they have charged accordingly. It is plain that if the company are right in this claim, they are at liberty to charge at their own pleasure for transportation between the cities; for if they can charge without limit on a single mile of the line of communication between the cities, they can make the charge from city to city what they please, notwithstanding the restriction to certain rates on the railroad. The Supreme Court had and could have no difficulty in denying this claim of the company.

But the Supreme Court have held that the word *thereon*, in the section fixing the rates of toll, does not mean the railroad, but means the whole line of communication between the cities; and that the company are entitled to charge on this whole line the rates of toll per mile fixed by the act. In this view I cannot concur. The distance between the cities is ninety miles. I see no reason for believing that the legislature intended to allow $9 for transporting a passenger, and $7.20 for transporting a ton of goods from city to city. The plain words of the act, as well as its provisions and general scope, are, it seems to me, opposed to this position of the Supreme Court. And the opinions already given by the other members of this court in this case enable me to say, that the majority of this court are unwilling to affirm its correctness.

The act gives no authority to the corporation to charge for transportation on and over the waters forming a part of the line of communication between the cities. No such charge, therefore, can be made, it being a familiar principle, that a corporation, a creature of law, has just such rights and powers as the law creating it gives it, and no other.

And the idea, contended for in argument, that the corporation, as the owner of the boats which the act requires it to provide, may charge as a common carrier, is manifestly excluded by the same principle.

It was said, in argument, that if the corporation be not allowed to charge as a common carrier on the said waters, it might not receive adequate compensation for transportation from the cities, respectively, to a point between the *termini* of its railroad. This only raises a question as to the adequacy of

the compensation fixed by the act. It would seem that the company entertain the idea that if, in reference to any particular commodity transported, or to any partial travel on their road, the act has not given them a sufficient compensation, they are at liberty to charge what they please for it, however great may be the profits which the act, as a whole, gives them.

It will hardly be contended that the transportation of goods or passengers across the Delaware, between Philadelphia and Camden, as *termini*, was an object of the act of incorporation. But if they can charge for the distance across the Delaware when they take a packet or passenger a mile on their road, why are they not entitled to make such charge if they only land the packet or passenger on the Jersey shore opposite Philadelphia? And so of the rate between the other extremity of the road and the city of New York.

The object of the act was an expeditious and complete line of communication between the cities of New York and Philadelphia; and the duty is imposed on the company to provide suitable vessels, at either extremity of the road, for the transportation of passengers and goods from city to city. The company are not bound to transport goods or passengers between Philadelphia and Camden, as *termini*, nor between New York and South Amboy, as *termini;* nor have they any authority to do so. And if they be bound to transport goods and passengers from the cities respectively, to any point or station on their road, they must do it for the compensation which the rate of toll per mile on their road to that point or station, fixed by the act, will give them.

The views of the company and those of the Supreme Court differ in two respects.

1st. The company say that the act gives them no right to charge for transportation on and over the said waters; that the word *thereon*, in the section authorizing them to receive tolls, means the railroad, and nothing else. The Supreme Court have said, that the said word *thereon* means the whole line of communication between the cities, and that, therefore, the act gives the company the right to charge for the whole distance between the cities, according to the rates per mile fixed

Camden and Amboy Railroad Co. v. Briggs.

by the act. On this part of the case, I concur in the views of the company.

2d. The company contend, that if the act gives them no right to charge for transportation on the said waters, they may charge for it as common carriers, and, of course, charge what they please. The Supreme Court say that if the act does not give the company this right they can make no such charge. In this respect I concur with the Supreme Court.

In the view I have taken of the case, the judgment must be affirmed.

RANDOLPH, J. In the discussion of this cause, two questions are raised for our consideration :

1st. Does the act of March 12, 1839, *Rev. Stat.* 601, to prevent the taking of unlawful tolls or fare on canals and railroads, apply to the case.

2d. Have the plaintiffs in error rendered themselves amenable to its provisions and penalty.

As the determination of the last inquiry, in some measure involves an answer to the other, I will first consider that question.

1st. The facts of the case are admitted. A bale of merchandise, containing two hundred and forty pounds, was transported by the plaintiffs for Bacon & Briggs, from New York, by steamboat, to South Amboy, a distance of thirty miles, and from thence to Trenton, by railroad, forty-one miles, making in all seventy-one miles, for which a compensation of ninety-six cents was demanded by the company, and paid by Bacon & Briggs. And it is also admitted that if the restriction, in the sixteenth section of their charter, of eight cents per ton per mile extends to the whole distance by water, as well as by land, from New York to Trenton, then there is an overcharge of some sixty-one cents, and the company have rendered themselves amenable to the penalty of one hundred dollars, sued for by Briggs as a common informer, provided the penal statute is applicable to the case. But if the restriction in the sixteenth section of the charter extends only to the railroad proper, leaving the company to charge, at their discretion, such sum for

the transportation by steamboats from New York to Amboy as they may think reasonable and just, and that the sixty-one cents was charged by them for that portion of the freight, then the company are in no wise liable to the penalty. I say charged, because that seemed to be the view of counsel on the one side, that, as the bill was made out generally from New York to Trenton, the rate per mile should be considered the same throughout, and therefore an overcharge; while, on the other side, it appeared to be thought that the company could at pleasure place thirty-five cents to the railroad, and sixty-one cents to the water carriage.

I presume that, if the facts set up constitute a bar to the action, the court would not deprive the party of the benefit of it on account of the formality or the informality of the bill or the mode of stating the account.

Whether the restriction of eight cents per ton per mile extends to the carriage by water, or is to be confined to the railroad alone, depends on the construction to be placed on the charter; and that depends on the intention of the legislature, if that can be arrived at satisfactorily.

It is well settled that penal statutes are to be construed strictly, and those of a remedial character more liberally, (1 *Bl. Com.* 88; *Paine C. R.* 32), while such as are intended for the public benefit are to be taken most strongly against the persons or corporations claiming rights or power under them, and most favorably for the public. 11 *East* 674; 3 *Man. & Gran.* 496; 7 *Ib.* 870; 1 *Railway Cases* 659; *Bac. Abr. title Statute I,* § 10.

But these rules are not to be resorted to, unless the intention cannot be clearly derived from the clause or section affecting the subject matter, or the whole charter itself. Let us inquire, then, what was the general intent of the legislature, to be collected from the whole charter; what the particular intent to be found in the sixteenth section. The *title,* which though it may not enlarge or restrict the act itself, may afford a means of explaining its doubtful passages, is, "An act to incorporate the Camden and Amboy Railroad and Transportation Company."

The first clause merely embraces the railroad company, like a turnpike company, limited by its *termini* from Camden to Amboy, on which tolls may be taken for the passage of cars, or the contents thereof. But it is the latter clause which makes the company common carriers, a transportation company along or over the road, but not restricted to its *termini*. The act itself contains some twenty-eight sections, most of which are used to designate the mode and means of organizing the company, and constructing the road, and the necessary appendages thereto, for a railroad or transportation company; while but few of the sections are inserted to define the powers, rights, duties, and restrictions of the company. Keeping this distinction in view, let us examine some of the sections as they occur.

The first section applies only to the opening of the books and the preliminaries to form a company. The second constitutes a company, by the name of " the Camden and Amboy Railroad and Transportation Company," with a capital of a million of dollars, powers to hold real and personal estate, of perpetual succession, to have and use a common seal, and to enjoy and exercise all the *rights, powers, and privileges pertaining* to corporate bodies, and necessary to *perfect an expeditious and complete line of communication from Philadelphia to New York, and to carry the objects of this act into effect.*" The next thirteen sections relate not to the general powers, rights, and restrictions of the company, but to its organization and the construction of the work; the subscriptions, how paid for, how forfeited, and when void; the meetings of the stockholders, election of directors and president; the compensation, duties, and meetings; the taking, appraising, and paying for land, materials, and damages; the construction of the railroad bridges, and passages over the same. The next section is the sixteenth, which relates to the general powers, rights, and restrictions of the company; but, between this and the second section, no general or corporate powers or rights are granted. The seventh section, though much relied on in the argument, grants no power to the company; it designates the duties of the board of directors, *viz.* to supply vacancies in the board; to appoint a treasurer and other officers and agents

required; to fix their compensation and the amount of their security; to decide upon the kind of carriage to be used upon the road, the weight to be carried, time of starting, rate of travelling; to provide suitable steam or other vessels, at either extremity of the road, for the transportation of passengers and produce; to regulate the tolls, superintend the receipts and disbursements, and all other affairs of the company, and make and enforce *by-laws*. Here is a mere specification of duties to be performed by the board of directors, all the power for doing or authorizing of which, by the company, is to be found in the second section, and not in the seventh itself, *viz.* in the general clause, granting all power to perfect a complete line of communication and to carry the objects of the act into effect. With regard to steam vessels, it states explicitly that it "shall be their duty to provide;" but unquestionably they had the right to do so by the second section, for such was necessary to perfect that complete line of communication by railroad and transportation from city to city, which was the object of the act to be carried into effect; and the insertion of this as a duty, in the seventh section, seems to have been, for abundance of caution, thrust · into the section between the duties relating to carriages, and the regulation of tolls therefor, as will be apparent on examining the seventh, being the corresponding section in the canal charter, passed on the same day. There no such duty relating to steam vessels is inserted, the company relying only on the same general power as that contained in the second section. Besides, if this clause relating to steam vessels were to be considered a distinct power, it would not aid us in determining the difficulty in this cause, for, if considered a power which would draw after it the right of taking tolls, freight, or fare for transportation from New York to South Amboy, then in like manner the power to construct a railroad from Camden to Amboy would draw after it the right to take tolls or fare for transportation between those two points; and so the sixteenth section would be unnecessary and nugatory, and the company have a perfect right, a common law right, as it has been termed, to take tolls and freight *ad libitum* from city to city without restriction. But there is

no such common law right : the law of a corporation must be found in its charter ; whatever power is there expressed or necessarily implied, in order to carry into effect those powers that are expressed within the general intent of the charter, constitute the only powers granted. The taking of tolls or freight is a distinct independent power, and cannot be implied from other powers granted. This has been repeatedly adjudged in the cases of turnpikes, ferries, and other granted franchises. *Olcott* v. *Banfill et al.*, 4 *N. Hamp. R.* 545 ; 2 *Mass.* 102 ; 1 *Pick.* 122 ; 7 *John. R.* 179 ; 18 *Ib.* 397 ; 1 *Pick.* 30 ; *Charles River Bridge* v. *Warren Bridge* ; 1 *Pet. R.* 545 ; 6 *Conn. R.* 240 ; *Stourbridge Canal Co.* v. *Wheeler*, 2 *B. & Adol.* 793 ; 2 *Har. Dig.* 2925, *tit. Navigation.* In this last case power was given to charge certain rates for every ton of iron and other goods navigated on any part of the canal, which should pass through one or more of the locks, and it was held that they had no common law or other power to charge the rates when the boats navigated the upper canal, where there were no locks. See *Angell and Ames on Corporations*, 3d ed. c. 3, 81, *et seq.* and cases referred to ; 6 *Pick.* 23, 32 ; 18 *Ib.* 501 ; 2 *John. R.* 109 ; 15 *Ib.* 358.

In questions arising on canal and railroad charters, as to the right to take freight or toll, or the quantity thereof, courts have uniformily construed the charter most in favor of the public and most against the company. *Barrett* v. *Darlington and Stockton Railway Company* ; 2 *Man. & Gran.* 134 ; same case in the House of Lords ; 7 *Man. & Gran.* 870 ; *Gildart* v. *Gladstone*, 11 *East* 675 ; *Proprietors of the Leeds and Liverpool Canal* v. *Hustler*, 1 *Barn. and Cress.* 424.

In the first fifteen sections of the charter there is to be found the incorporation of the railroad and transportation company, for the purpose of creating a complete line of communication between New York and Philadelphia, with full powers for that purpose ; the provisions for organizing the company, appointing its officers, constructing the road, and placing carriages thereon, and steam vessels at either termination to complete the route. All is prepared for a successful experiment of the great enterprise. But one power of an important charac-

ter, the right of the company to compensate themselves by taking tolls or freight, has not yet been granted. That is to be found in the sixteenth section, the particular object of which is to provide for this deficiency. By this section the company are "authorized to demand and receive such sum or sums of money for tolls, and the transportation of persons and every species of property whatsoever *thereon*, as they shall from time think reasonable and proper; *provided*, that they shall not charge more than at the rate of eight cents per ton per mile for the transportation of every species of property, nor more than ten cents per mile for carrying passengers." This embraces a grant of power to charge for tolls and transportation, and a restriction upon that grant, the latter not limited by phrase or word to any part of the route in particular, but doubtless intended to be coextensive (and no more) with the former; so that if the word "thereon," in the first branch, restrains the charge for tolls and transportation to the railroad only, between the terminations of Camden and Amboy, the restriction, as to the amount of such charge, is also restrained within the same limits, for it would be absurd to place a restriction on a portion of the route over which no power was granted : it would be a restraint upon a power which had no existence.

Is, then, this power or restriction limited to the road proper, or does it extend to the route? It is insisted that the word " thereon " limits it to the road only, because the first term, which is applicable for its antecedents, is the word "railroad," in the fifteenth section. Doubtless, in several sections, the word railroad is the appropriate, as well as the grammatical antecedent to the word *thereon*. Thus, in the seventh, "traveling thereon" refers to the word railroad, a few lines preceding. And so in the twenty-third section, respecting transit duty. And so, also, in the twentieth and twenty-sixth sections of the canal charter, where the same word occurs several times, it refers to the terms canal and feeder, either before or after, in the same sections. But there is no necessary connection between the words " thereon " and " railroad," for in the eleventh section it refers to the antecedent words " embankments and

bridges," and in the act of February 4, 1831, relating to the railroad and transportation company, the word refers to the thousand shares of the capital stock to be transferred to the state. Nor does it follow that, in search for the antecedent of the word "thereon," you must necessarily seize the first word that may answer the reference, for that word may occur in a section which has nothing to do with the subject matter, and be used or placed in that position accidentally; thus the word railroad is used in the fifteenth section, and it is taken as the necessary antecedent to the word thereon, in the sixteenth, though the latter section relates to the general powers of the company, while the former only to the bridges and passages over or across the railroad, and is placed in the position it occupies accidentally, without any necessary connection with the succeeding or preceding sections, and might have been placed in any other part of the charter. Any other section might have occupied the position of the fifteenth with equal propriety. Had it been the twelfth, then the antecedent would have been the lateral road from Bordentown; and thus the power and restriction, as to tolls and freight, would have been confined to that road only. These considerations go to show that, although the word "railroad," in the fifteenth section, may be the antecedent of the word "thereon," in the sixteenth, it does not follow that it must be such, or that it was the intention of the legislature so to restrict it. To ascertain that we must look beyond the fifteenth section into the charter itself. Had the sixteenth section immediately followed the second, little doubt could be entertained that the power and restriction, as to tolls and freight in the former section, would refer to and be governed by the description of the line of communication from city to city, as described in the latter. So far as relates to the general powers of the company, the sections do follow each other; all between relates to other matters, and may be considered as in a parenthesis, or in some other position in the statute: thus placing them would remove any ambiguity arising from the word "thereon." But was not the word "thereon" placed in the sixteenth section in order to show the sense of the legislature, that the tolls and freight were to extend to the

route, and not to be confined to the road only? Without it the sense would have been complete, yet it would have left the distance on which to calculate mileage obscure, therefore some word would have been sought to define it. In the corresponding section of the canal charter, which is generally in the same words as this, instead of the word "thereon," is inserted the term "canal and feeder," which express all that was required in that charter, because that was a mere canal, and not also a transportation company, extending from river to river, without injunction to place steam vessels at either extremity, and was created for the mere purpose of opening a water communication between New York and Philadelphia; and when the canal was constructed, and opened from river to river, the "complete line of communication," mentioned in its second section was accomplished, and boats and merchandise could pass through the whole line on the same element, and no tolls or freight could with propriety be required, except on the canal and feeder.

With this charter, then, in the hands of the legislature, either just passed or passing, their attention would naturally be called to the different powers of the companies, and the respective positions which they occupied in regard to tolls and freight. If, then, it had been their intention that these should be limited to the road itself, would they not have inserted the word *railroad* instead of the word "thereon," as they had just inserted "canal and feeder" in the other charter? This would have been easy and natural; but if intending the section to extend to the whole line, it would have been exceedingly awkward to have placed in it the whole description, as set forth in the second section; and so, for the want of a better word, instead of such description, and as if in reference to it, they inserted the word "thereon." This construction will appear the more reasonable when we look at the intention of the restriction as to toll and freight. The road was made from the then inconsiderable town of Camden to the much less considerable place of South Amboy; the transportation of property or passengers merely between these two points was of very little importance, and indeed could not have been intended by

the legislature or the company ; whereas the carrying of passengers, produce, or merchandise from New York to Philadelphia, or from some point in the state to either of those cities, constituted the grand object of the company, as expressed in various sections, and was of vast importance. Can it, then, for a moment be supposed that the legislature would have been so careful to restrict the transportation to eight and ten cents per mile between Camden and Amboy, and leave the company to charge what they pleased between city and city, or between any point in the state and either city, while they granted them an entire monopoly of the business ? Would they have placed any restriction at all, if they had not done it, or thought they had done it, on the whole route ? Would they intentionally leave open a link in the chain of communication which destroyed all they did ? Beyond all question the legislature could have had no such intention ; and as the language which they used may extend to the whole route quite as appropriately as to the road only, we are bound to give it that construction ; the power to charge and the restriction are coextensive, and both extend to the whole route. But it is objected that the granting this power, and the restriction thereon to operate upon the water as well as upon the land, is an interference with the constitution, as expounded by the Supreme Court in *Gibbons* v. *Ogden*, 9 *Wheat.* 1. That was a case where one party held an exclusive right to navigate by steam the waters lying in the state of New York, under an act of that state, granting to Fulton and Livingston an exclusive right ; and the court decided that such grant was in violation of the constitution and laws of Congress : that the bays and navigable waters were free alike to all the states and citizens, to navigate by steam or otherwise. But it was never pretended in that case that a state legislature could not charter a company to navigate the waters in any state, or even the ocean itself. If the company seek the protection and security of a state charter, they are bound, as a company, by the restrictions and penalties of that charter, and of the legislature that grant it, though any individual member of the company may exercise the right of a citizen, and do the same thing on his own re-

sponsibility without restriction : and this in no way interferes with the constitution or the exclusive powers of congress ; it is no restriction of commerce or of the rights of individuals ; no exclusive grant or prohibitory use of the waters within or without the state ; no imposition of taxes, duties, imposts, or excises on vessels, or the cargoes thereof, but simply a power granted to a corporation, and a restriction thereon by the granting power ; not intended to operate on the persons of individuals, or their vessels or property, but simply on the corporation itself, on whom is conferred the right, imposed the duty, and is added the restriction.    An individual, it has been urged, may do the same things unrestricted, for the waters are free.    True, but when a company of individuals ask of a state a portion of its sovereign power to enable them, by land and water, to complete a line of communication between New York and Philadelphia, and to do this not under their individual names and responsibilities, but like a sovereign, with its capacity to act under its own seal in its corporate name, they cannot complain if the state that grants them this shall add all proper restrictions.    It is no more than is constantly done to the various pilot companies, steam navigation companies, whaling companies, and others, chartered by state legislatures.

In disposing of one question, we have virtually settled the other ; for if the sixteenth section of the charter extends to the whole line of communication,.then the overcharge for transportation from New York to Trenton is an overcharge upon every mile of the railroad travelled, and of course brings the company within the penalty of the statute, unless the fact of the penal act being passed some ten years after the charter, is a violation of the contract.    But as its object is only to compel the company to fulfil their part of the contract, and inflicts a penalty only in case of its violation by them, of course it cannot come within this objection, for it neither violates or suffers the violation of the contract.    The statute imposes a penalty of one hundred dollars upon any incorporated company in this state, authorized by law " to charge for transportation," which shall· directly or indirectly, " under. any pretence," take more than the rates of fare allowed by law, to be sued for before

any justice of the peace of any county through which the railroad or canal passes. It is of no consequence where the offence was committed, whether on land or water, in the state or out of it, if it was by an incorporated company in this state authorized to take tolls, and was contrary to law. The phrase, to be sued for before any justice of the peace in any county in this state, through which the railroad or canal passes, does not limit or restrict the offence to any particular county, for the description of that is completed by the former part of the act; the restriction is merely as to the remedy or action, and would seem to imply that by "incorporated companies," in the preamble and previous part of the act, the legislature only intended railroad and canal companies, and not ferry or other incorporated companies, authorized to take fares or tolls. It has been urged before the court with much force, that the duty imposed on the company to carry small packages of valuable merchandise for this restricted compensation, being a small fraction of one cent per pound, from New York to Trenton, would be exceedingly onerous and unreasonable, and that it ought not to be required. There would certainly be weight in the suggestion, had the court the power to adjust the burthen or relieve from the difficulty; and on the first examination of the charter, it did occur that possibly the restrictions of "eight cents per ton per mile" might be limited to the ton or larger transportations; but the legislature have superadded "*at the rate of eight cents, &c.*," showing that the company were to carry small as well as large parcels at the same price, no such graduating phrase being added in the succeeding line in relation to the transportation of passengers: and the same distinction is made in the canal charter; but no such distinction occurs in either charter in regard to the transit duty, there it is simply so much per ton.

The construction of the charter contended for by the company, is said to have been honestly given, and acted on for many years, without supposition that it was in violation of their right and duty, and that the decision of the Supreme Court has already brought hundreds of penal suits and actions for the overplus charged, and that its confirmation by this

court would be exceedingly injurious, if not ruinous to the corporation. If the question before us admitted of serious doubt in the minds of the court, this argument certainly would be entitled to grave consideration ; but placing it, as we must, beyond all doubt, in our judgments, this court cannot look at consequences, but must administer the law as they find it.

To-day, it is true, we are called upon to protect the individual rights of the citizen against the alleged aggression of the company ; to-morrow we may be asked to protect the chartered rights of the company against the aggression of the citizen ; but in the performance of our duty, we can give no higher assurance of the security of the one, than by our judgment for the protection of the other. The judgment below must be affirmed with costs.

Judge SPEER. In the argument of this cause, several questions were presented, not necessary to be decided by the court at this time. The defence set up in behalf of the plaintiffs in error rests upon the question, " whether this company have a right to charge as common carriers for services rendered in discharge of duties, imposed by their charter upon them as a transportation company ?"

In my opinion, they have not. The company is the creature of legislation, clothed with such powers and rights, only, as are derived from the legislature by specific grant and necessary implication. A right to charge for transportation is expressly granted in the charter, and is there accompanied by a limitation coextensive with the right itself.

Applying this view of the rights and powers of the company to the facts of the case before the court brings the act of the company complained of in this case within the language of the penal statute under which this suit is prosecuted. By the provisions of that act, any incorporated company in this state, authorized by law to take toll or charge for transportation of passengers, goods, &c., which shall take or demand more than the charge, toll, &c., allowed by law, shall forfeit and pay the sum of one hundred dollars, to be sued for, &c. I can find nothing in the reasons urged before the court, by the counsel

Camden and Amboy Railroad Co. v. Briggs.

of the company, which satisfies my mind that this company are not amenable to the provisions of that statute.

I am, therefore, of opinion that the judgment of the Supreme Court be affirmed.

Judge SCHENCK. This was an action of debt, brought by Peter Briggs, the plaintiff below, against the Camden and Amboy Railroad and Transportation Company, for the recovery of a penalty of one hundred dollars, under the act to prevent the taking of unlawful toll or fare on canals and railroads, for an alleged violation of law in charging more than they were authorized to charge for the transportation of certain merchandise from the city of New York to the city of Trenton, by the way of South Amboy and Bordentown.

The plaintiff below proved that the defendants, on the twenty-ninth day of January, eighteen hundred and forty-six, charged Briggs & Bacon, partners, trading, &c., the sum of ninety-six cents for one box, of the weight of two hundred and forty pounds, for the transportation of the same from the city of New York, by the way of the Camden and Amboy railroad, to Trenton ; that the same was transported, by the steamboat of the company, from New York to South Amboy, a distance of thirty miles ; thence, in the cars of the company, over the company's railroad, to Bordentown, a distance of thirty-five miles ; and thence, over the company's railroad, to Trenton, a distance of six miles, the whole distance being seventy-one miles ; and that the said transportation was done by and for the benefit of the said company, the defendants below. The bill was paid by the plaintiff below to the agent of the company. The justice gave judgment thereupon for the plaintiff for the penalty of one hundred dollars and costs. And it is agreed by and between the parties, by their respective attorneys, that if, upon the above state of facts, the plaintiff below was entitled to recover, then the judgment be affirmed, otherwise that it be reversed.

The Court of Errors and Appeals, on the above state of the case, are asked to reverse the judgment of the Supreme Court, on two grounds, viz :

*First.* Because the penal act, passed March 12, 1839, to prevent the taking of unlawful toll or fare on canals and railroads (and under and by virtue of which act the above suit was brought, and judgment obtained,) was enacted subsequently to the act incorporating the Camden and Amboy Railroad and Transportation Company, and therefore inoperative, void, and of no force or effect against the company.

*Second.* Because there was no evidence that the company had taken or charged unlawful fare or toll on the said railroad or roads.

Before entering upon the consideration of the reasons assigned for reversal of the judgment of the Supreme Court, it may be proper to remark, that the company make no allegation that the charge was made, and received by them or their agents, by mistake or inadvertence, but claim the legal right of making the charge by virtue of their corporate powers.

This being the position assumed by the company, our inquiry will be directed to the first reason assigned for reversal, *viz.* " that the penal act, passed March 12, 1839, was enacted subsequently to the act incorporating the Camden and Amboy Railroad and Transportation Company, and therefore inoperative, void, and of no force or effect against the said company." The reason here given for reversal can only have validity, either because the penal statute of March 12, 1839, was an *ex post facto* law, or because its provisions were of a character to impair the contract between the Camden and Amboy Railroad and Transportation Company and the state of New Jersey, entered into by virtue of the act incorporating said company, passed February 4, 1830. If either of these positions can be sustained, then the penal act under which this suit was brought comes in conflict with that provision of the constitution which declares that the legislature " shall not pass any bill of attainder or *ex post facto* law, or law impairing the obligation of contracts." Is the penal statute above referred to inoperative, void, and of no force or effect in the case now under consideration, in consequence of its being violative of the constitution of this state or of the United States, as an *ex post facto* law? or do its provisions impair the conditions of the contract made

with the Camden and Amboy Railroad and Transportation Company by the act of incorporation already referred to ?

With regard to the first branch of the prohibition relative to an *ex post facto* law, it certainly has no application to this case. The act imposing a penalty of one hundred dollars for taking unlawful fare or toll, became a law of the state March 12, 1839. The charge of demanding and receiving unlawful fare, on which this suit is founded, was made January 29, 1846. It is therefore manifest that, at the time the taking of unlawful fare is complained of, the law fixing the penalty had been in existence several years.

In the next place the inquiry presents itself, whether there be any substantial reason for the proposition in this case, that the penal statute of March 12, 1839, impairs the contract made between the legislature of New Jersey and the Camden and Amboy Railroad and Transportation Company by the act of February 4, 1830, and therefore inoperative and void against the said company. The act of incorporation recognizes the liability of the company to the provisions of the act entitled, " An act to prevent frauds by incorporated companies," section 26th of the act. And as there is no provision, expressed or implied, in the act of incorporation exempting the company from the operation of any penal statute which may be subsequently passed " to prevent the taking of unlawful fare or toll on canals and railroads," this reason has no validity, and needs no further comment. The first reason, therefore, assigned for error, and on which reversal is asked, is not substantial, and cannot be sustained.

With regard to the second reason assigned, *viz.* that there was no evidence before the court to prove that the Camden and Amboy Railroad and Transportation Company had charged unlawful fare or toll on their said railroad or roads, it can only be determined by reference to the provisions of the act itself. In the case before us, it is admitted that the said company did transport 240 pounds of merchandise from New York to Trenton, for Briggs & Co., a distance of seventy-one miles, part of the distance, *viz.* thirty miles, by steamboat, and the residue of the distance, forty-one miles, on the company's

railroad, and in their cars, for which transportation they charged and received from the said Briggs & Co. ninety-six cents, which is more than at the rate of eight cents per ton per mile for the transportation of the said merchandise.    But it is alleged by the company, that the charge of ninety-six cents was for the whole distance ; and that on part of the distance the transportation was made by steamboat on the navigable waters between Amboy and New York ; and that the rate of fare or toll prescribed in sixteenth section of the act applies only to transportation of goods and merchandise on the said railroad, and not in steamboats on the water.    Such is the construction which the company allege they have given to the act, and which they contend before this court is the true and legitimate construction.    If this be so, then there is no evidence that the company have charged more than at the rate of eight cents per ton per mile on the railroad ; for if the rate of charging, as prescribed in the sixteenth section of the act, is limited to the railroad, then the company may charge any amount of fare by steamboat, or other vessel, which in their discretion they may think reasonable and proper, on either extremity of the " line of communication from Philadelphia to New York."    The question, therefore, to be determined by the court is, whether the construction contended for by the company is in accordance with the provisions of the act of incorporation.    To arrive at a correct conclusion on the subject in controversy, our attention must be directed to the act itself, the whole act, the object to be accomplished, the powers conferred upon the incorporators, and the restrictions imposed.    The act of incorporation, which gave existence to " the Camden and Amboy Railroad and Transportation Company," was passed February 4, 1830.    It resulted from an application of several individuals, who were willing to embark in the enterprise of establishing " a line of communication from Philadelphia to New York," which line of communication should consist in part of a railroad, and in part over navigable waters, the transportation to be made, at either extremity of the railroad, with steamboat or other vessel.    In accordance with the wishes of the applicants, the legislature, as heretofore stated,

passed an act clothing with corporate powers such individuals as might associate in the enterprise, specifying in the said act, section second, that the corporation thereby created should "have, enjoy, and exercise all the rights, powers, and privileges pertaining to corporate bodies, and necessary to perfect an expeditious and complete line of communication from Philadelphia to New York, and to carry the objects of this act into effect."

The object, therefore, contemplated by the legislature, and provided for by the act, is clearly defined to be the establishment of an expeditious, continuous, and complete line of communication between the two great commercial cities already mentioned; and, to secure the accomplishment of this object, it is provided, by the seventh section of the act, that "it shall be the duty of the company to provide suitable steamboats or other vessels, at either extremity, for the transportation of passengers and produce from *city to city*, so that no delay shall occur for want thereof, and that no impediment shall be offered to persons or property travelling on the railroad."

The object for which this company was incorporated being distinctly defined, and the powers granted and the privileges conferred being also definitely specified in the act of incorporation, we are next brought to inquire, by what authority and by what rule of charging for the transportation of persons and property on the said line of communication from "*city to city*" the company are to be remunerated for their investment in the enterprise.

The sixteenth section of the act of incorporation provides, that the said company are hereby authorized to demand and receive such sum or sums of money, for tolls and the transportation of persons and every species of property whatsoever thereon, as they shall from time to time think reasonable and proper; *provided,* that they shall not charge more than at the rate of eight cents per ton per mile for the transportation of every species of property, nor more than ten cents per mile for the carrying of each passenger." The correct and appropriate construction to be given to the word "thereon," in the fourth line of this section, has been elaborately discussed by the coun-

sel for plaintiffs in error. It has been maintained with much earnestness, that the word "thereon" applies exclusively to the transportation of merchandise and every species of property on the railroad of the company, and not on the free navigable waters between South Amboy and New York, on which the merchandise and other property is carried in steamboats or other vessels. That this is the true intent and meaning of the act, is inferred by plaintiff's counsel.

*First.* From correct grammatical construction of the act, counsel insist that the word "thereon" must relate to some substantive which has gone before. That, in the application of this grammatical rule to the phraseology of the section under consideration, the conclusion is inevitable, that the word "thereon" must relate to the railroad, as there is no other antecedent to which it can consistently refer, either by proximity or affinity.

In this effort of counsel to supersede the fair and legitimate construction of the act (as clearly indicated to be the intention of the legislature by the whole tenor of the act), they have not, in my opinion, taken a tenable position. The word "railroad," in the fifteenth section, immediately preceding, is not so used or applied as to indicate any distinct object or design for which a railroad was authorized by the legislature. It relates in no way to transportation or a highway, and, consequently, if used in no other section, could not, by implication or otherwise, have relation to tolls, fare, or merchandise, or charges for passengers. In every instance in which it is used in this section, it is preceded by the word "said;" the "said road" is repeated several times, and in such connection as to make it clearly understood that its signification had been previously defined in the act of incorporation. We are to look, therefore, to some other part of the act to determine its appropriate meaning, and whether, by sound grammatical construction, it should be subjoined to the word "thereon," in the sixteenth section. In the eleventh section of the act, by which the corporate powers of the company are enlarged and specified, it is also provided that the company shall have power "to do all other things which shall be suitable and necessary for the

effectual completion of " said road or roads, *and to carry into full effect the objects of this incorporation.*"

What, then, is the object of this incorporation ? Can any one hesitate to believe that the intention of the legislature was to establish a line of communication from " city to city," expeditious, unbroken, and complete ; which line, when completed, to be used for the transportation of persons and every species of property whatsoever without impediment or delay ? And, having provided for the establishment of a complete line of communication from " city to city," the act proceeds to prescribe the mode of remuneration by which the company may demand and receive toll and fare for persons or property carried on said line.

The word " thereon " must apply to the whole line, and not to any particular part ; as no discrimination is made in the act designating the particular part on which fare may be demanded, none can be presumed by implication. The purpose of the legislature is kept prominently in view throughout the whole act, that the railroad was designed to be a part of the whole line from " city to city," and not regarded as a separate and detached portion, liable to restrictions or favored by peculiar privileges not applicable to the whole line.

*Secondly.* In support of this construction, it is further contended that the legislature never could have intended to extend the rate of fare at eight cents per ton per mile, on either extremity of the line, beyond the *terminus* of the railroad, because the navigable waters are free to all, and the legislature have no jurisdiction over those waters. If this be so, if the legislature have no power to prescribe the rate of fare on that part of the line which lies across the navigable waters between Amboy and New York, then the company can demand no fare whatever for merchandise transported on their steamboats or other vessels by virtue of their corporate powers.

But it is maintained that the company may charge and demand fare on their steamboats and other vessels as common carriers, and as common carriers they are not limited by the rate of fare prescribed by their charter ; but to claim authority to demand a higher rate of fare for transportation by their

steamboats than the maximum prescribed by the legislature, is an assumption of power not conferred or conceded by the act of incorporation. No right whatever is granted to the company to transform themselves at pleasure from being carriers under the charter to become carriers at common law. Suppose any individual should deliver a quantity of merchandise to one of the agents of the company's line at South Amboy, to be carried in the line to New York, and, on delivery of the said merchandise in New York, the agent should demand, by the company's orders, at the rate of fifteen cents per ton per mile for transporting the same, and payment refused on the ground of the charge being unlawful, could the company sustain an action by virtue of their corporate powers, at that rate of charging, for transportation from South Amboy. to New York? or could they sustain an action as common carriers for merchandise carried on their line as a privileged company? But, to make a case more directly in point, suppose, in the suit now before the court, the defendants in error had refused to pay the charge of 96 cents for the transportation of 240 pounds of merchandise from New York to Trenton, because unlawful, could the company have sustained an action in a twofold capacity of common carriers for thirty miles of the distance, and privileged carriers for the remaining forty-one miles?

The act of incorporation makes it the imperative duty of the company to keep steamboats or other vessels at both extremities of the railroad, so.that no delay shall be caused to the transportation of persons or property on the line of communication established by the charter. Now if the legislature were authorized to impose this duty on the company, and if they did possess the power to command the observance of it, by what mode of reasoning or by what form of argument can it be maintained that the legislature did not intend, and have not prescribed the rate of fare to be charged on either extremity of the line extending from " city to city."

Again, it has been contended, and insisted by the counsel for the company, that the " line of communication authorized and fixed by the act of incorporation is declared to be a public

highway," and, as such, is open to competition, and may be used by others as carriers of persons, merchandise, and other property, and that the community have abundant guaranty for moderate charges by the ordinary operation of competition; that the rates of fare must necessarily be reduced to the lowest point by opposing competitors for the business of transportation on this public highway. Any legislative prescription therefore, fixing the maximum rate of charging on the whole line, would be superfluous, and result in no benefit to travellers or persons transporting merchandise thereon.

It may be sufficient to remark, in answer to this argument, that no competition has ever been attempted, either by individual or associated enterprise, and that any protection, therefore, which might be secured to the public by rival carriers, has never been experienced. But let us examine this proposition, and ascertain, by reference to the charter, whether it be true, in point of fact, that this line of communication is a publich highway for any purposes of competition. Is it accessible to any, as a medium of transportation, except to the company? Can any individual or individuals become carriers on this line by the payment of tolls, without the consent and approbation of the corporators?

The road, with all its appendages, is declared to be the personal property of the company, the whole line of communication from "city to city" is controlled by the direction of the company, for their exclusive benefit, and the powers they exercise and the profits and advantages they enjoy is by virtue of the act of incorporation. By the seventh section, it is provided that the directors, or a majority of them, "shall decide upon the description of carriages to be used on said road, the weight to be carried in a carriage, the times of starting, and rates of travelling." The power hereby granted, if there were no other, is abundantly comprehensive and efficient to enable the company to exclude all competition. The proposition, then, that this road is a public highway, cannot be sustained by reference to the act itself, and is contradicted by the fact, that no competition has ever been attempted.

But, admitting that there is ground for diversity of opinion,

as to the intention of the legislature in some of the provisions of this law, owing either to the novelty of the subject or the vagueness of the language employed in specifying the details of the act, are we left to grope our way in the dark, directed only by the dim light of conjecture, guided in our judgments by what we may individually regard as expedient or inexpedient? For myself I feel no such embarrassment. If I do not greatly err, there lies at the bottom of this inquiry a fundamental principle, · on which we may safely establish an opinion, legitimate, sound, and substantial.

The principle is this, that all legislation must be construed relative to the fundamental elements of the government under and by authority of which laws are enacted. The spirit of our free institutions not only justifies, but imperiously requires, that where doubts arise in the construction of legislative acts, whereby exclusive privileges are vested in a few, the construction should be favorable to the rights and interests of citizens at large, and adverse to the few who claim to exercise doubtful powers.

Judge SINNICKSON. I am of the opinion that the word "thereon," in the sixteenth section of the charter of the company, means the railroad ; and that the company have no right to charge beyond the extremities of their road, either under the charter or on any other ground.

OGDEN J. The argument was heard in this cause upon the facts set forth in a state of the case, agreed upon by the attorneys of the parties.

It is an action of debt, brought by Peter Briggs against the company, to recover a penalty of $100, under "An act to prevent the taking of unlawful toll or fare on canals and railroads," passed in March, 1839. (Rev. Stat. 601.)

On the 26th of January, 1846, the company charged Briggs & Bacon, partners in business, residing in Trenton, ninety-six cents for the transportation of a box, weighing 240 pounds, from the city of New York, by a steamboat of the company, to South Amboy, a distance of thirty miles, thence, in the cars of the company, over their railroad, to Bordentown, thirty-five

miles, and thence in their cars, over their railroad to Trenton, six miles, the entire distance being seventy-one miles.

The bill was paid by Mr. Briggs (the plaintiff below) to an agent of the company.

2. The plaintiff insisted, before the courts below, and again in this court, that the charge made by the company for transporting said box was more than their charter allowed, and that, under the general act of the legislature, before referred to, they had forfeited a penalty of $100, which he, as a common informer, was entitled to recover, with costs.

The overcharge is claimed to flow from a violation of the sixteenth section of the act incorporating that company; and, in the language of the senior counsel for the prosecutor, the question must be resolved by the settlement of two propositions.

1st. Does the limitation, not to charge more than at the rate of eight cents per ton per mile for transportation, extend from New York to Philadelphia? and if so,—2d. Are the company liable to the penalty of the statute of March, 1839, which, by the judgment of the justice and of the Supreme Court has been applied to them?

The first depends upon a proper construction of a charter, in the nature of a contract, between the legislature and the company, granted to promote and accomplish a great internal improvement. The second rests upon the legal construction and application of a highly penal statute, enuring *exclusively* to the use of the informer, irrespective alike of the party overcharged, as also of a charitable or remunerative appropriation of any portion of its penalties.

The nature of the first inquiry has led to an elaborate and ingenious discussion of the charter incorporating " the Camden and Amboy Railroad and Transportation Company," and more particularly of the provisions of that portion of the sixteenth section thereof, which bears upon the compensation to be charged by them.

Most of the preceding sections contain enactments touching the organization of the company, the procurement of lands, and the laying out and constructing of a railroad or roads,

with all necessary appendages, from the Delaware river, in the then county of Gloucester, to a point or points upon the Raritan bay.

The fifteenth section imposes a duty upon the company of constructing and keeping in repair bridges or passages over the *said railroad or roads*, where any other roads shall cross the same. By the sixteenth section, it is thus enacted : " That the said company are hereby authorized to demand and receive such sum or sums of money, for tolls and the transportation of persons, and every species of property whatever thereon, as they shall from time to time think reasonable and proper; *provided*, that they shall not charge more than at the rate of eight cents per ton per mile for the transportation of every species of property, nor more than ten cents per mile for the carriage of each passenger, and that the *railroad or roads* and their appendages, and all other property belonging to the company, are hereby vested in the said company during the continuance of this charter."

The legislative meaning and application of the word *thereon*, in this connection, has created whatever doubt is urged as embarrassing this branch of the case.

It may be contended, in support of the judgment below, that the design of the legislature in granting the charter was to have perfected " *an expeditious and complete line of communication between Philadelphia and New York;*" that a duty is therein imposed upon the corporators to provide suitable steam or other vessels, at either extremity of the railroad, for the transportation of passengers and *produce* from city to city, so that no delay should occur for want thereof; and that the whole scope of the charter looked to the accomplishment and use of the entire route. From those premises the argument was drawn, that, in conferring powers to demand and receive compensation, the legislature contemplated that such power should be exercised upon the whole extent of the desired line of communication; and that they also imposed their restriction upon the whole line.

Both parties concede that the grant of a power to charge,

and the restriction thereof, are *coextensive ;* so that the determination of the former will necessarily settle the latter.

It was answered, in behalf of the company, that the words of the sixteenth section are not ambiguous, but are susceptible of a plain construction, without resorting for aid to the whole scope of the act ; but if not so, then that the legislature did not mean in the sixteenth section to extend the *power* and apply the *limit* beyond the railroad proper.

In support of this aspect of the case, it was urged that the relative word " *thereon* " is the controlling one in that paragraph ; that its antecedent is to be sought in the context, *as the sections are placed in the charter ;* that the *railroad or roads proper,* having been the subject of the next five preceding sections, they should be taken as the antecedent ; and that overlooking them, and passing back to the second section, and thence taking " *the entire line of communication between the cities* " for a proper antecedent to " *thereon,*" would violate every principle of grammatical and established rules of construction.

The first section provides for opening books for subscription ; the second fixes the capital stock, gives the corporate name, and confers the general powers pertaining to corporate bodies, and necessary to perfect an expeditious and complete line of communication from Philadelphia to New York and to carry the objects of the act into effect.

Let us examine the several provisions. The third section regards the subscriptions for the stock ; the fourth, the effect of insufficient subscriptions ; the fifth and sixth, the mode of electing directors and their president ; the seventh confers powers on the directors for supplying vacancies, appointing other officers, deciding upon the description of carriages to be used on the *road* when completed, the weight of loads, times of starting and rates of traveling, regulating of tolls, and making by-laws for the general government of the company and its officers, and, for the prevention of delay, requires the provision of suitable boats at either extremity.

The eighth, ninth, and tenth sections regard annual exhibits, special meetings of stockholders, and elections in certain cases.

The eleventh section, prefacing it to be "for *facilitating the objects of the act*," confers the powers necessary to survey, lay out, and construct a *railroad* or roads, with all necessary appendages, from the Delaware river to the Raritan bay. The twelfth provides for a lateral *railroad* to Bordentown ; the thirteenth authorizes the taking of required lands and materials for the railroads upon making compensation, as therein is directed ; the fourteenth gives an appeal from the tribunal for compensation established in the thirteenth section ; the fifteenth imposes upon the company the duty of constructing suitable bridges and ways where any road shall cross the said *railroad* or *roads*, and where the said *railroad* shall intersect a farm : then follows the sixteenth section, which enacts, that the company are thereby authorized to demand and receive such sum or sums of money, for tolls and the transportation of persons and every species of property whatsoever *thereon*, as they shall from time to time think reasonable and proper, limited by the restriction already recited.    As the sections are placed in the act, the construction of the limitation contended for by the plaintiffs in error is consistent with the language employed and the rules of grammatical construction ; and should, in my judgment, prevail, unless its consequences would conflict with other plain provisions of the charter, or defeat the obvious intention of the legislature, as developed by the whole act.

It was not alleged, in argument, that there was any other enactment upon the matter of compensation which should influence the construction of the sixteenth section ; but this branch of the case was put by the prosecutor, upon the ground, that confining the restriction to the *road* would defeat the intention of the legislature to guard the public against excessive charges, by providing a limitation coextensive with the route upon which, as transporters, the company were authorized by the act to operate.

The great design of the legislature was to confer those powers and privileges upon a company that were necessary to perfect a line of communication from the one city to the other, for the more expeditious and desirable transit of pas-

sengers and property between those points, and likewise to and from intermediate points upon the line. The eleventh section authorizes the location and construction of a railroad from the Delaware river to the Raritan bay, to facilitate the *objects* of the act; and it is fair to assume that the representatives of the people of the state, in parting with a portion of her sovereignty to individuals, circumscribe its exercise within *such* bounds as a due regard for the interests of the public would dictate.

In behalf of the company it was said, that such protection was extended by applying the restriction exclusively to the roads, inasmuch as the waters were free, and the portions of the route from the respective *termini* of the railroad would be open to competition, which would regulate the charges thereon.

In seeking for the intent of a legislative body, it is proper to consider the state of things existing at the time of the passage of the act under examination. This company was incorporated when railroads were in their infancy in this country. The line of communication from Philadelphia to New York was then maintained by stages and transportation wagons between the Delaware and Raritan rivers, and by steamboats from the *termini* of the land routes and from the cities.

These boats were then maintained by others than the applicants on this road in successful and competing operation, at charges much less upon passengers and tonnage than would result from the maximum rates allowed to the company in the sixteenth section. A distinct and antagonistic application was also at the same time before the legislature, desiring a charter for the construction of a canal from the Delaware to the Raritan; and so jealous was each company of the rival adventurers, lest the other should obtain more favorable terms from the legislature, that the two charters were framed in identical language, as far as the nature of the respective improvements would allow, the second section of each contemplating, in words, the perfecting of "an expeditious and complete line of communication from Philadelphia to New York." The two applications were kept, by their respective advocates, in like state of advancement before the legislature, and both charters

were eventually passed on the same day. So far as we can now enter into the views then entertained of the expected operations of these institutions, it is reasonable to suppose that a brisk and healthful competition was fully anticipated.

The companies continued under advancing management for one year, and on the 15th of July, 1831, when the canal company was seeking powers to construct a railroad, the act was passed authorizing a consolidation of the two stocks.

I have made this historical digression for the purpose of showing that the intention of the legislature regarding the operation of the sixteenth section, when sought in the language adopted, and the object they had in view, and the whole scope of the charter, is not so manifest as not to have afforded ground for honest differences of opinion upon the construction of the limitation.

Locomotive engines were not at that time in successful operation here, and the prevailing idea undoubtedly was, that the railroad would be used by individuals as a public highway, under the twenty-eighth section of the charter, subject to such regulations as the company might ordain under the powers granted to them in the seventh section of the same.

Such, however, has not been the result. The main carrying business upon railroads, in this country and in England, has fallen into the hands of the companies themselves.

In the present case, the company have stocked the railroads with carriages and motive power; have provided, as a part of their corporate property, steam vessels at each *terminus* of the road ; and have established, and do conduct such lines of transportation, both for passengers and property, as effectually to preclude all competition in the use of their railroad, or of the rivers in *connection with* their roads.

Such appropriation of the benefits of the road has centered in the company the entire carrying business upon that line between the two cities, and it has become a matter of grave importance to the public how far they can be restrained, under their charter, in their charges for transportation. If the construction, advisedly adopted and openly and professedly acted upon by them up to the time of the commencement of this

suit, be the only one of which the phraseology of the act is susceptible, then their power to charge upon the water must be declared by this court to be *discretionary*, and the limitation imposed upon the railroad must practically become a nullity.

Experience and authority teach that, when called upon to construe grants of powers to companies of this nature, if the language is ambiguous, courts should establish that construction which will be most favorable to, and protective of the interests of the public, and comport with the ascertained intention of the legislature.

Such charters are universally granted upon the application of individuals. The language used should be considered as their language ; and if it is open to a fair doubt, and great inconvenience would result from a particular construction, that construction should be avoided, unless the meaning of the legislature be plain ; and the act should be construed *strictly* against the corporators.

Influenced by a policy which contemplates, in grants of such powers, a suitable protection against unlimited charges, I am of opinion that the language of the sixteenth section is not so plain as clearly to indicate a legislative intent of confining the power to charge within the *termini* of the railroads ; and hence, that the restriction in the section should be taken as extending over the whole line of communication from New York to Philadelphia completed by the corporators under the powers of their charter, and used by them in the exercise of their privileges as a " transportation company."

This result brings me to the consideration of the second proposition which I shall endeavor to dispose of with more brevity.

I think the justice who delivered the opinion of the Supreme Court erred in premising that " the only question for the consideration and decision of the court was, whether the charge made by the company is greater than the law authorizes them to make," as neither the state of the case nor the facts shown confine us to that one point.

It does not, then, in my judgment follow that, in giving the

foregoing construction to the charter, we must *necessarily* decide that " the plaintiff below was entitled to recover." He came before a judicial tribunal of the state as an informer, demanding a judgment for $100 costs against the company for a forfeiture, charged by him to have been incurred in virtue of a penal statute.

His attitude entitled him to no liberality from the court, nor should any intendment be made in his favor. If he, as a member of the firm of Bacon & Briggs, had been overcharged, their redress was open in an action for the money overpaid ; which remedy still will exist unaffected by the determination of this branch of the case.

If the act of the 12th of March, 1839, construed and executed upon those conservative rules applicable to penal statutes " which the wisdom of ages has sustained," and, in the language of Chief Justice Marshall, " are founded on the tenderness of the law for the rights of individuals, and on the plain principle, that the legislature, and not a court, is to define a crime, and ordain its punishment ;" if, I say, thus construed, it embraces this case, the judgment below should be affirmed ; but if it does not, the judgment, in my opinion, should be reversed.

The statute under which the suit was instituted is *entitled*, " An act to prevent the taking of unlawful tolls or fare on canals and railroads."

The preamble is in the following language : " Whereas complaints have arisen that some of the incorporated companies of this state have taken a greater amount of *fare* or *toll* than is allowed by law, and also of the unequal, fluctuating, and unlawful rates of *toll* or *passage money* upon the several canals or railroads of this state, therefore "—

Then follows the enacting clause.

" That any incorporated company or companies in this state, which is, are, or shall be authorized by law to take toll, or to charge for the transportation of passengers, goods, wares, or merchandise, which shall, directly or indirectly, through or by any agent, director or other officer whatever, take or demand of any passenger or person, under any pretence whatever,

more than the charge, toll, rates, or fare allowed by law, shall forfeit and pay the sum of $100 for each and every such offence, to be prosecuted for and recovered, with costs, before any justice of the peace in any county of this state through which the said railroad or canal may pass, in the name and for the use of the person or persons prosecuting for the same."

The counsel for the company have insisted that the plaintiff was not entitled to recover, because the statute does not apply to the evidence in this case. They urged that, if the company have made the overcharge complained of, it having been done upon the water portion of the whole route, their error does not fall within the provisions of this act.

Although their bill was rendered for the charge in gross, yet if the amount was made up by a computation at eight cents upon the railroad and the excess upon the steamboat, as they allege, the mode of announcing the charge in gross, no items having been required of them, cannot change their liability under the penal act.

For the purpose of reaching a satisfactory conclusion, it is proper to examine the act, and, if practicable, to test the intention of its framers, as maintained on either side by the language adopted.

It would be unsafe to assume that, in penal prosecutions, a case is within the reason or mischief of the statute, and hence within its provisions, unless the plain meaning of the words used warrants such conclusion.

Does the description, " *any incorporated company in this state,*" necessarily embrace the plaintiffs in error ? If so, the same description will include the various incorporated *steamboat* and turnpike companies in the state, who may charge or take unlawful fare, rates, or toll, without any jurisdiction being established for entertaining the prosecutions.

Failing then, from the general descriptive words of the enacting clause, to divine the intention of the legislature, it is next proper to examine other portions of it, in quest of that guide for a construction.

The latter clause thereof provides that the action shall be brought before a justice in *some county* of this state through

which the *said* railroad or canal may pass.   Is it not indicated, by this expression, that the mischief, which the legislature intended to remedy, was being committed upon some *railroad* or canal within the state ?

Suppose that the box of merchandise had been delivered at the office of the company in New York, to be transported to Perth or South Amboy, and they had charged and been paid for that service upon their boat the sum of fifty-five cents, instead of thirty cents, which latter would be the charge for it, if computed upon the restriction in the sixteenth section, would the penalty of this act have attached ?   If so, where and before whom should the action be brought ?   The box would not in that case, as yet, have touched any railroad carriage or canal boat.

This insistment, that transportation upon *canals* and railroads was alone in the contemplation of the legislature, is likewise supported by the *title* and the *preamble*, although when, by the enacting clause, the intent is so plain that nothing is left for construction, *it* should control ; yet in cases of dubiety the *title* may be invoked to assist in removing the ambiguity, and the preamble may be used as a key to open the intent of the law makers.

This is entitled, " An act to prevent the taking of unlawful tolls or fare *on* canals and railroads."

The preamble sets out " that complaints have arisen that some of the incorporated companies of this state have taken a greater amount of *fare* or *toll* than is allowed by law ; and also of the unequal, fluctuating, and unlawful rates of *toll* or *passage money upon* the several *canals* or *railroads* of this state."

It, in terms, locates the mischiefs complained of *upon* the canals and railroads, thus disclosing the inducement for the act ; while the title, in language, professes to prevent *such illegalities* " *on canals and railroads.*"

If these portions of the enactment throw any light to guide in the construction of the act, do they not direct us to that conclusion which will confine its penalty to cases occurring *exclusively* upon canals and railroads ?

This is the highest grade of penal statutes affecting property. Unlike the " act to prevent the unlawful waste and destruction of timber in this state," which appropriates one half of the penalty to the owner of the land, or the act against usury, which gives one half for the use of the state, this presents the strongest inducements for speculative prosecutions against companies, irrespective of the extent of the overcharge and of all circumstances of justification.

It makes no allowance for mistakes, misunderstandings, or honest differences of opinion as to legal rights, but fastens its punishment upon the subjects of its penalties, if, " *under any pretence whatever*," they happen to make a charge in good faith which may thereafter for the first time be adjudicated to be illegal.

Penal statutes are to be construed strictly against the prosecutor, and in cases of ambiguity the court is bound to decide in favor of the accused. Livingston, J., *Paine's N. York Cir. Ct. R.* 32.

He continues, " They ought not, by what may be considered their spirit or equity, to be extended to offences which are not *specially* and *clearly* described and provided for in terms which leave *no* reasonable doubt of their meaning."

If it be the duty of a jury to acquit where such doubts exist concerning *facts,* it is equally incumbent upon a judge not to apply *the law to secure,* where he labors under the *same* uncertainty as to the meaning of the legislature. Nor is a court bound to conclude that a legislature *have* done what they intended, unless *fit* words be used for the purpose.

" The *language* employed must authorize the determination of a case to be *within* a penal statute. *Probability* of legislative *intent* is not a guide which can safely be taken in construing a penal statute."

It would be dangerous, indeed to carry out the principle, " that a case which is within the reason or mischief of a statute *is* within its provisions, because it is of a kindred character with those enumerated in it." Chief Justice Marshall, 5 *Wheat.* 76, &c.

Upon these principles and by these rules penal statutes should be construed. No intendment is to be made in favor of the informer. If the present act does not reach as far as ascertained evils require that it should reach, it is far safer to leave the matter to the wisdom and sound discretion of the legislature than to seek a cure by judicial legislation.

It is proper, from suggestions made upon the argument, that we should ascertain whether the act of 1839 partakes of the qualities of a remedial statute. It is true that a penal statute may be a remedial law; and, also, that a penal statute may be penal in one part, and remedial in another; in which latter case, however, each clause should be construed by the peculiar rules applicable to its distinctive character.

This act has but one aspect, the imposition of a penalty. In providing for that, it recognises and constructively affirms the legality of tolls and rates allowed in existing charters; but "an affirmance of an anterior law cannot properly be styled remedial." *Dwarris on Statutes*, 637.

Remedial acts have been divided into *enabling* and *restraining* statutes. *Ib.*

They are made to supply the defects discovered in the common law, from whatever cause such defects arise; by *enlarging* it where found *too* narrow, or *restraining* it where too luxuriant. *Ib.* 641–2.

If, by analogy to the common law rule, we are permitted to test the character of a statute by its effect upon another statute, we cannot escape the conclusion, that the act under examination neither enlarges nor restrains the provisions of the charter of this, or of any similar company. It suggests no defects; it provides no remedy which did not before exist; it merely adds to the common law remedy, which every injured party had for redress against an illegal charge for toll or fare, an independent forfeiture of a penalty to any person who may sue for the same.

Although the defendants below are a corporate company, yet their vitality and ability to act and carry out the objects of their charter spring from the enterprise and the capital of

individuals, thus involving rights which are entitled to the common protection and law of the land.

Being clear in my conviction, that the act of 1839 is not in any portion thereof remedial, but that it is a purely penal statute of the most punitive class, which if legally construed cannot be applied to the facts of the present case, I am of opinion that upon this ground the judgment should be reversed.

Judge PORTER. The first section of the act incorporating the railroad company provides for opening the books for subscription to the stock, &c., the second section divides the capital stock into shares, &c., and gives them power to make and use a common seal, and to exercise all powers pertaining to corporate bodies, and necessary to perfect an expeditious and complete line of communication from Philadelphia to New York.

There being a line of steamboats then running from Amboy, on the Raritan Bay, to New York, the railroad from Camden to Amboy was necessary to perfect an expeditious and complete line of communication; therefore clearly inferring that it was not to make, but to perfect, with what already existed, an expeditious line of communication.

The seventh section provides that the officers of the company shall decide upon the description of carriages to be used on said road, when completed, the weight to be carried in a carriage, the times of starting and rate of travelling, so that no injury may be done to said road, or impediments offered to persons or property travelling *thereon;* and it shall be their duty to provide steam or other vessels, at their extremity, for the transportation of passengers and produce, so that no delay shall occur for want thereof, shall regulate tolls, &c.

The fifteenth section makes it the duty of the company to construct and keep in repair good and sufficient bridges or passages over the said railroad or roads, where any public or other road shall cross the same; and when the said railroad shall intersect the farm or lands of any individual, to provide and keep in repair suitable wagon ways, &c.

The sixteenth section authorizes the company to demand and receive such sum or sums of money, for tolls and the transportation of persons and every species of property whatsoever *thereon*, as they shall from time to time think reasonable and proper; *provided*, that they shall not charge more than at the rate of eight cents per ton per mile, for the transportation of every species of property.

This, in my opinion, gives the company the right to charge such reasonable sum for toll and transportation of property as they may think proper only on the road or roads incorporated by this act, and extends the restriction of eight cents per ton per mile to the same. That the word *thereon*, in the sixteenth section, refers to some antecedent, and, by the fair reading of the act, it refers to the word railroad or roads, in the section immediately preceding, and should be so read as though the word railroad had been written in its place.

From South Amboy, on the Raritan bay, to the city of New York, a distance of about thirty miles entirely over the water, which is an arm of the sea and beyond the geographical limits of the state, the legislature have, by this charter, granted no privileges and imposed no restriction, leaving the compensation for transportation on this part of the line from city to city to be charged by the company, as common carriers over navigable waters.

It is admitted that the package, for which an overcharge of freight was alleged to have been made, was carried over the water from New York to Amboy, and on which, in my opinion, the penal statute does not apply.

The judgment of the court below is therefore erroneous, and should be reversed.

Judge McCARTER concurred in the opinion expressed by Judge PORTER.

*For affirmance*—The CHANCELLOR, Justice RANDOLPH, and Judges SINNICKSON, SCHENCK, and SPEER.

*For reversal*—Justice OGDEN and Judges McCARTER and PORTER.

The CHIEF JUSTICE and Justices NEVIUS and CARPENTER had given opinions in the court below, and Judge WALL was a director of the company.

Judgment affirmed. (a)

CITED *in Mor. & Essex R. R. Co.* v. *Sussex R. R. Co.*, 5 *C. E. Gr.* 562; *Black* v. *Del. & Rar. Can. Co.*, 7 *C. E. Gr.* 401.

(a) The Supreme Court of the United States, in the case of *John A. Perrine* v. *The Chesapeake and Delaware Canal Co.*, 9 *Howard* 172, decided at January term, 1850, (contemporaneously with the Briggs case) maintain the doctrine held in this case by the Court of Errors, that a corporation cannot *take toll* or exercise any other corporate power when not clearly granted by their charter. In that case, the charter having *omitted* to authorize the demand of toll for passengers, it was held that passengers are entitled to pass on the canal toll free. See, in opinion of Taney, C. J., 184 and 192.